U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Jan 27 - 2025**

John M. Domurad, Clerk

**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------X   **JURY TRIAL DEMANDED**

Mariah Lopez,                                          Case 1:24 cv 01516

**PLAINTIFF**


                                                        **AMENDED COMPLAINT**

-against-


The YWCA of North East New York, Tamara Rayne aka

Tamara Flanders, Kimberly Siciliano,

Ahmed Alloush,Yunis Alloush, and

Jean Doe 1-20

**DEFENDANTS**

-------------------------------------------------------------------------X


**AMENDED COMPLAINT**


# Parties

### Plaintiff

1.  Plaintiff is 39 years old and resident of the State of New York.

2.  Plaintiff currently resides in the City of Schenectady at 121 Park Place, 12305.

3.  Plaintiff identifies as Afro-Latina, Transgender-woman.

4.  Plaintiff who came out as Trans as a young teenage has been involved with and or won several

    'landmark' cases in furtherance of LGBT and Trans civil rights, including Jean Doe v Bell which

held that Trans people located in the state of New York being treated for gender dysphoria are

entitled to protections under the NYS Human Rights Law. Plaintiff will make repeated reference

to this case as she asks this court to find that the Defendants failed to uphold her basic rights

under state law.

5. Plaintiff is also legally disabled and receives monthly SSI benefits.

6. Plaintiff is a survivor of severe childhood abuse —the New York City foster care

system—domestic violence and human trafficking.

7. Plaintiff has a history of chronic homelessness, after being discharged into homelessness when

she turned 21. Plaintiff struggled with homeless for over a decade before she was able to gain

long term housing services through the YWCA.

8. Plaintiff relocated to Schenectady New York in 2019 after living in New York City for all of her

life save a few short period

9. In the Fall of 2022, then again in the Spring of 2023 Plaintiff's counsel from New York Defender

Services were successful in petitioning the court in New York county to grant relief under

440.10(1)(i), finding that Plaintiff had been the victim of human trafficking.

10. These identifying factors make Plaintiff eligible for a host of housing prevention and

crime-victim services from agencies which receive state and federal funding including:

homeless-prevention services, rapid rehousing and more.

11. Plaintiff began receiving counseling at the YWCA of North East New York in 2022. In May 2023

Plaintiff accepted a placement within a housing program operated by the Defendants  the YWCA

of North East New York called Rosie's House

12. This Housing program is funded by grants provided or supervised by the U.S. Dept of Housing

and Urban Development or HUD among a host of state-run agencies such as the New York State

Office of Temporary Disability Assistance, the NYS Office for the Prevention of Domestic

Violence others.

13. Plaintiff requested a number of reasonable accommodations to aid her daily activity while she is enrolled in Rosie's House including the need for and possession of a service dog, as well as an exemption to a number of policies which contradict her medical care and needs.

14. The Defendants agreed to provide her with a number of reasonable accommodations however now they have since reversed course or retaliating against plaintiff for asserting her rights as a person living with disabilities (such as the YWCA turning a blind eye while Yunis Alloush continues to threaten and harass Plaintiff Mariah Lopez.

## **The Defendants**

### **The YWCA of North East New York**

15. The Defendants the YWCA of North East New York (hereafter referred to as to the "YWCA" are a non profit organization located in Schenectady New York, which provides an array of services to the surrounding area and community, including but not li tied to housing, advocacy financial assistance.

16. The YWCA is a public accommodation.

17. Historically the YWCA has exclusively served cisgender women and their families, specifically those who have experienced homelessness and or domestic abuse.

18. Historically Transgender women such as the Plaintiff were barred from accessing services at the Y.

19. Plaintiff asserts that the anti transgender and or transphobic sentiment and culture which was fostered within the Y for over a century is in its DNA and persists within the organization to this day.

20. Today in 2025 the organization is required by state and federal law to provide services to both cisgender and Transgender individuals alike.

21. The Defendants the YWCA receive millions of dollars from state and federal based agencies such as the NYS Office of Children and Family Services, the Office of Temporary Disability

Assistance (to provide services to victims and survivors of domestic violence and human trafficking including the Plaintiff), and as stated above HUD just to name a few.

22. A number of staff who work for the YWCA have chosen to discriminate against the Plaintiff sue to her identity; as a person protected under a number of categories including but not limited race, sex, disability, gender expression/identity and retalition for exercising other rights guaranteed to her under the U.S. and New York State Constitutions respectively.

## Defendant Kimberly Siciliano

23. Kimberly Siciliano is the current CEO of the YWCA.

24. Ms Siciliano supervises Ms Tamara Rayne-Flanders and other named and unnamed Defendants.

25. Ms Siciliano reviews and approves every major decision within the Y.

26. Ms Siciliano does not enjoy any immunity as an officer acting on behalf of the Y, as she was personally and directly involved in deprivations of Plaintiff's civil rights.

27. These include negligent hiring, training and supervision (of staff and programs under her charge), encouraging Y staff and subcontractors to submit and file false and or exaggerated information, or turning a blind eye to the same.

28. Ms Siciliano engaged in these actions in part because Plaintiff is transgender, as well as in retaliation for Plaintiff making a number of reasonable accommodations requests, as well as complaints about how she is treated within the Y.

29. As a direct result of Ms Siciliano's actions and negligence Plaintiff has experienced pain, suffering, emotional distress, humiliation, loss of valuable and sentimental items and belongings and more.

30. Defendant Kim Siciliano conspired with the YWCA, Tamara Flanders Yunis Alloush and Ahmed Alloush to devise ways to deprive Plaintiff of her civil right, including creating a hostile home/housing environment.

31. Accordingly Ms Siciliano is a proper Defendant in these proceedings.

## Defendant Tamara Flanders

32. Defendant Tamara Flanders is the director of the Housing Program at the Y, and does not enjoy any immunity as an officer of said organization, as she was personally and directly involved in deprivations and violations of Plaintiff's civil rights.

33. Between May 2023 and today Ms Tamara Rayne-Flanders acted directly to deprive Plaintiff of her civil rights by submitting false and or exaggerated reports and testimony, in part because Plaintiff is transgender,  as well as in retaliation for plaintiff making a number of requests for reasonable accommodations, as well as complaints about Ms Tamara Flanders and how she (Plaintiff) has been treated within the YWCA.

34. Plaintiff makes the accusation of anti trans discrimination against Tamara Flanders Rayne based on Defendants proud political views as a Trans Exclusionary Radical Feminst.

35. Tamara Flanders Rayne identifies as an out white lesbian. Plaintiff posits her actions and behaviors towards Plaintiff barely conceal her views that Tragnder women are second class queer-cirzens and can be treated thusly

36. Ms Flanders has and continues to collude with Defendants Ahmed Khaled Allous and Yunis Alloush in order to deprive Plaintiff her civil and constitutional rights; specifically her housing.

37. This includes sharing confidential information about Plaintiff's Transgender status with them (other Defendants)

38. Defendant Tamara Flanders Rayne conspired with Yunis Alloush, the YWCA, Kim Siciliano to devise ways to deprive Plaintiff of her civil rights.

39.  Defendant Tamara Flanders Rayne has overseen and participated in a coverup of the same.

40. As such  Defendant Tamara Flanders Rayneis a proper Defendant in these proceedings.

**Defendant Ahmed Khaled Alloush**

41. Defendant Ahmed Khaled Alloush owns a number of properties here in Schenectady, including a residential property at which Plaintiff resides, #121 Park Place, 12305

42. Between May 2023 and the present Defendant has acted to discriminate against Plaintiff because she is transgender, and, to retaliate against her for making a number of good-faith complaints concerning the apartment unit in which she resides.

43. Ahmed Alloush has engaged in harmful and negligent supervision and hiring practices

44. Defendant Ahemed Alloush conspired with the YWCA, Kim Siciliano and Tamara Flanders to devise ways to deprive Plaintiff of her civil rights.

**Defendant Yunis Alloush**

45. Defendant Yunis Alloush is the son of Ahmed Khaled Alloushand.

46. Defendant states he is the property manager for a number of said properties owned by Defendant Ahmed Khaled Alloush (including the property where Plaintiff currently resides).

47. Between May 2023 and the present the Defendant Yunis Alloush has repeatedly discriminated against plaintiff on the basis of: her race, disability, sex, gender identityand religion, and, as a tenant of the state of New York who has made good faith complaints about the conditions of her apartment .

48. Defendant Yunis Alloush has subjected plaintiff to verbal abuse, harassment which has been both sexual and non sexual in nature; as well as constructive eviction

49. Defendant Yunis Alloush conspired with the YWCA, Kim Siciliano and Tamara Flanders to devise ways to deprive Plaintiff of her civil rights.

50. Plaintiff asserts that Defendants actions between May 2023 and the present are unlawful, intentional, done with forthout and or malice and violate her rights as guaranteed under The Constitution of the United States, The Fair House Act; The Rehabilitation Act the Americans with Disabilities Act;18 U.S.C. § 241-42 conspiracy against rights; 42 U.S.C. § 1985; 28 U.S. Code § 4101. The New York State Constitution, The New York State Human Rights Law (NYSHRL) New York Executive Law § 290 et seq.; Executive (EXC) CHAPTER 18, ARTICLE 15§ 296-d Unlawful discriminatory practices relating to

non-employees; he New York State Real Property (RPP) CHAPTER 50, ARTICLE 7§ 223-b(a),(b),(c-2); Article 15 of the Executive Law (EXC), prohibitions on discrimination based on sex, race, religion, disability, national origin; Real Property Actions & Proceedings (RPA) CHAPTER 81, ARTICLE 7 (i),(ii),(iii),(b).

**First Cause of Action**

51. After Plaintiff had been seeing a therapist at the YWCA since 2022 she became a resident of its housing program called "Rosie's House" in May 2023. She quickly discovered a number of serious issues with the unit that were not evident to her when she accepted it, including black mold, dangerous appliances.

52. Plaintiff complained about the conditions of her subpar unit in good faith only for the YWCA to respond by retaliating against her through a scheme which included using false or exaggerated rule violations to attempt to evict her from Rosie's house

53. **Second Cause of Action** (segregation/separate and unequal)

Upon showing her the unit at Madison Street Defendant Tamara Rayne informed Plaintiff that the previous tenant had (also) been transgender. Plaintiff believed this to be a coincidence until she realized through records obtained from local landlord tenant court in Schenectady that the YWCA had targeted the previous Transgender tenant with unlawful eviction (as well).

54. Plaintiff alleges that she was placed at th the apartment at 3 Madison Street in May 2023 was used by the YWCA to house Transgender clients because it is less favorable than the apartments it rents cisgender clients.

55. Such a policy can be viewed as "outing" Plaintiff as Transgender as well as disabled since Transgender individuals enjoy 'duel' protections as part of their gender expression

under the human rights law as well as it relates to (plaintiff's) disability (see NYS *Jean Doe v Bell* 2003).

56. **Third Cause of Action**

57. Plaintiff has been denied access to the same full array of services clients. Plaintiff asserts that this discrimination is based in part due to numerous complaints she has made internally about the way she's been treated; complaints to Schenectady Codes Enforcement about violations inside her units and the lack of certificates of rental; her identity as a part of a number of protected classes and for pursuing litigation against them.

58. Examples of deprivation of standard services available to similarly situated clients i of the YWCA include but are not limited to denying her the same case management and advocacy services (which include helping her apply for benefits as a survivor of human trafficking, even after they agreed to do so); denying her the same regular maintenance services by YWCA maintenance staff .

59. In May 2023 Defendant Tamara Rayne told Plaintiff that she could expect maintenance staff from the YWCA to complete a number of basic tasks such as installing curtains inside her apartment as well as assemble a new bedframe for Plaintiff.  She told the plaintiff that normally the YWCA would provide the bedframe but agreed to Plaintiff was welcome to her own.

60. However when the maintenance person arrived plaintiff maintains he already knew she was transgender because Tamara Rayne had told him as much, and as a result he was unwillingly to put any effort into assembling her bedframe and made excuses about being

able install the curtains, without which the inside of the unit was clearly visible from the street.

61. **Fourth Cause of Action**

62. Plaintiff alleges that when she made a call to complain— in front of the maintenance person that she felt she was being treated unfairly—the maintenance person just flat out refused to complete any further repairs and left. Plaintiff has no family or friends locally —being originally from NYC—and depended entirely on the services she had been offered (such as basic privacy in her unit and a bed to sleep on). As a result of him not completing his work Plaintiff was forced to sleep on the floor that night.

63. Plaintiff remained on the phone with the YWCA (staff) and left her apartment headed to the YWCA main office and campus located 2-3 minutes away.

64. **Fifth Cause of Action**

65. When plaintiff arrived at the  YWCAcampus shortly after the maintenance person, he was able to see her entering an adjacent building where her therapist and program administrator Sarah Caterina was located. Plaintiff did not go into the building where the maintenance person was located or approach him in any way.

66. Still, reading that Plaintiff was likely going to file a formally complaint about his conduct back at her apartment the maintenance responded by making a false report to 9-11 (9-11) . No crime was committed or even alleged but the police were called and so they responded. On information and belief the plaintiff submits that.

67. The maintenance person claimed he needed police assistance because Plaintiff wouldn't return a set of tools which were left behind in her unit (no exchange about any tools occurred between the parties, period).

68. Another staff person named Danielle called police or possibly used the same call to 9-11 to allege there was an altercation and or hostile person threatening staff. Both statements were outright lies.

69. **Sixth Cause of Action**

70. The police have historically harmed the plaintiff so she avoids interaction or exchanges with members of law enforcement. The first time she was brutalized both physically and otherwise by the police she was fourteen years old. This abuse was well documented as the Plaintiff was under the care of the New York City Administration for Children's Services.

71. Plaintiff has been diagnosed with PTSD as a result of this abuse at the hands of members of law enforcement and suffers from severe and debilitating symptoms which include everything from insomnia, depression, anxiety; hypervigilance and more.

72. On May 23rd 2023 when the two YWCA staff called 9-11 as a form of retaliation against the Plaintiff she happened to be with her therapist and program administrator Sarah Caterina.

73. This meant she was able to requested a Reasonable Accomodation on the spot (plaintiff used the exact phrase requesting to be exempt 'from an existing policy which relied heavily on use of police (intervention) unnecessarily' due to her well documented medical condition as stated above.

74. Having treated Plaintiff for her PTSD Sarah Caterina agreed to grant her reasonable accommodation. She told Plaintiff not to worry about the police coming to look for Plaintiff at her office (as they were in a separate building). Plaintiff watched Sarah Caterina tell a number of YWCA staff including Kim Siciliano (over the phone) that she

was safe, that she wasn't in any danger and that most importantly the police should not be called or sent to her office

75. Still Plaintiff was shocked and in fear when she saw a police car outside and officers explained to her that someone reported she was refusing to return a set of tools (which never happened)

76. **Seventh Cause of Action**

77. On May 26th 2023 the same YWCA maintenance person who discriminated against Plaintiff by refusing to work do in her apartment and who made a false police report as asked to deliver and carry a piece of furniture inside; only for a number of female staff and administrators to surround the male maintenance person as if protecting him from Plaintiff.

78. Upon moving into her first apartment provided by the YWCA in May 2023 located at 3 Madison Street Plaintiff made several specific good faith complaints including black mold in the refrigerator, a stove that would give her an electric shock when she used it. The apartment also had wall to wall heavy dark brown carpet which didn't appear to be as filthy as it turned out to be when Plaintiff first toured the unit. As the summer went on the carpet became to smell and Plaintiff complained, asking the YWCA it might be possible for them to pick up the cost of shampooing or even replacing it but they refused.

79. Other serious or pervasive issues at the property included generally unsanitary conditions. There were even a few safety issues outside of her unit which Plaintiff complained to the Defendant Tamara Rayne about including a neighbor's dog which would occasionally escape its owner's apartment to attack the Plaintiff (and her own two dogs).

80. The Defendants of the YWCA, Tamara Rayne retaliated against Plaintiff for complaining about these conditions by formulating a civil conspiracy with Yunis Alloush to place her at a new apartment/location with the aim of evicting her.

81. **Eighth Cause of Action**

In January 2024 The YWCA used the pretense of the false eviction to place Plaintiff at a new location chosen by the YWCA Kim Sicliano and Tamara Flanders with the goal (in part ) of creating conflict between her and her new neighbors. Defendants' goal was to use fabricated infractions they believe would flow from these conflicts to evict from the housing program within one year. At this point January-February 2024 Plaintiff had not received a single infraction or 'notice of rule violation' from the YWCA or Tamara Rayne.

82. Plaintiff asserts that the YWCA Kim Siciliano and Tamara Rayne Flanders worked with and encouraged close friends of the agency, subcontractor and landlord to a number of YWCA clients Yunis Alloush to rent them an apartment at which current tenants have made previous noise complaints..

83. The Defendants selected a property which they believe would lead to conflict between Plaintiff and her neighbors so that they may use what they believed to be low hanging fruit in the form ready-made a rule violation (for noise complaints or other such 'nuisance' violations which are mostly subjective)  so they could have a reason to put her out of the program.

84. Plaintiff's downstairs neighbor is an man named Antonio Feliz.

85. Mr Feliz is elderly and has submitted an affidavit in this matter in which he states and alleges that he believes the YWCA and Yunis Alloush placed plaintiff in an apartment above him at 121 Park Place because he too has complained about the conditions at the

property, and noise from previous tenants in particular. This is in large part due his diagnosis of tinnitus which makes him sensitive to sounds and noise in his environment.

86. **Ninth Cause of Action**

87. The subcontractors hired by the defendants the YWCA to move Plaintif from 3 Madison St. to 121 Park Place did destroy a number of her personal possessions owned by the plaintiff, including several valuable religious items which Plaintiff keeps at her door and keeping with her faith, an African based belief system known as Santeria.

88. One of these subcontractors (movers) hired to help move her from one unit to another did Sexually harass the plaintiff making lewd remarks while inside her apartment and asking questions to her history as a human trafficking survivor, such as asking her if she is a stripper or sexworker.

89. The same subcontractor described above who destroyed the religious item blatantly tried to bribe her after complained.

90. After the group of movers had left Plaintiff received a text message from the same one (subcontractor) asking her to send them, the subcontractor, her Venmo, or cash app. Plaintiff was stunned and refused to accept any funds from this person.

91. Plaintiff notified Defendants YWCA Kim Siciliano and Tamara Flanders about the misconduct by the subcontractors, as well as the destruction of her personal property, only for the defendants them to minimize these violations.

92. The defendants minimized plaintiff attempts at recovering damages from the loss of her property including thereligious items destroyed by the subcontractor hired by the YWCA, because these Items were associated with an African based religious system, one which

the Defendants did not fully recognize on par with other major religions, such as Christianity, Islam, Buddhism, etc.

93. Defendants have refused to offer any good faith reimbursement or other payment for the loss of her property, which Plaintiff has estiminated could cost $10-20k (due to the religious rites associated with addressing the taboo of damage of such an important and venerated spiritual object).

94. **Tenth Cause of Action**

95. When Plaintiff she formally entered into the YWCA's housing program on May 15th 2023 the Defendants the YWCA Kim, Siciliano and Tamara Flanders informed The Plaintiff that consumption of cannabis, especially for medical reasons like PTSD was exempt from any prohibitions defining "smoking" broadly in any paperwork she was asked to sign. Defendants explained that tobacco and illicit drugs were the targets of any anti-smoking information informed by the YWCA.

96. The defendants were aware of plaintiffs' medical conditions (which include PTSD but also include a number of other medical conditions which have resulted in chronic and acute pain experienced by the Plaintiff) which required her to consume cannabis for relief of her symptoms. The defendants explained to the plaintiff that she did not need to worry about the paperwork she signed because it was *clearly* an old document (by its very appearance) written long before marijuana decriminalized in NYS in 2021.

97. But long after moving into her new apartment at 121 Park Place Plaintiff became the target of selective enforcement of the rules at the property by Defendant Yunis Alloush —no doubt working on behalf of or with the YWCA and Tamara Rayne Flanders— when he visited her unit and told her that she was not allowed to consume marijuana (inside her

own apartment), even though multiple other tenants who live there openly consume marijuana and the defendant has never complained to them about it or otherwise tried to enforce any no smoking policy.

98. **Eleventh Cause of Action**

99. March 2023, after one of the last heavy snowfall of the season and after she slipped at 121 Park Place While walking her dogs, plaintiff requested that the defendants Ahmed Alloush and Yunis Alloush clear up snow and ice which was preventing her from safely walking her dogs.

100.    Plaintiff asserts that she made this complaint in good faith and that the Defendants Ahmed Alloush and Yunis Alloush have been retaliating against her ever since, in part by neglecting the property and issues in her unit even further.

101.    **Twelfth Cause of Action**

102.    Upon moving into her new unit at 121 Park Place Plaintiff documented and reported to the Defendants a number of issues which were relatively minor, but which needed attention nonetheless and which impacted her enjoyment.

103.    These included a huge hole in the bathroom wall, extremely poor water pressure; an outlet which appeared to have experienced some type of shortage or burn out without being replaced, and there was even a rodent issue. Plaintiff discovered mouse ruin and droppings inside her oven and pantry.

104.    Most of the issues cited above have still not been addressed by the landlord a year after Plaintiff first moved in.

105.    Plaintiff maintains that these good faith complaints about issues resulted in further retaliation against her by the defendants Ahmed Alloush Yunis Alloush the YWCA of

North East New York. This retaliation included but isn't limited to further schemes to target her with minor (subjective) alleged 'rule violations' in order to deprive her of her housing.

106.  **Thirteenth Cause of Action**

107.  In the Spring of 2024 Plaintiff learned that 121 Park Place and her unit in particular lacked a valid rental certificate from Schenectady Code's Enforcement, which seemed to explain the issues inside her unit.When Plaintiff informed the YWCA, Kim Siciliano and Tamara Flanders of this they denied that this was the case (even though in confirmation as to the lack of a valid rental certificate for either unit came directly from the Mayor's office, City of Schenectady).

108.  The Defendants retaliated against plaintiff for these good-faith complaints by banning her from the YWCA main campus/offices.

109.  One day in the the Spring of 2024 Plaintiff showed up to (to get a drink of water, use the restroom and maybe get a snack) only to be told through an intercom that "Tami (Tamara Flanders) said you're not allowed here..", "..I can't let you in, she doesn't want you here.." Plaintiff was confused and stunned so recorded part of this exchange through the intercom on her cell phone. She felt embarrassed and humiliated and singled out at not being able to enter just to use the restroom.

110.  Later the defendants attempted to backtrack any ban and denied targeting the Plaintiff they hadn't targeted her but claimed to have  implemented a brand new organization wide policy ending drop-in hours. This was a lie.

111.  By design the YWCA's social-service model and mission—treating women who may be in crisis or need services only accessible by walking in when the need arises, or

providing a number of other daily or rolli no sevrices like meals, snacks, and onsite groups open to all YWCA clients—could not work if walk ins weren't welcome.

112.    **Fourteenth Cause of Action**

113.    In June after Plaintiff had complained and reported the lack of valid rental certificate for her apartment to the YWCA and the City of Schenectady an inspection was scheduled to take place.

114.    On the morning of the inspection Defendant  fabricated an ealleged newfound fear of Plaintiff's service dog to avoid having the unit inspected by codes enforcement.

115.    Defendant ordered Plaintiff to place her sevrice dog inside a room for the duration of the inspection (even though he knew the dog is friendly and is there to aid Plaintiff with her PTSD symptoms).

116.    Eventually, several days later codes enforcement officers rescheduled the inspection directly with Plaintiff

117.    **Fifthteenth Cause of Action**

118.    During the summer of 2024 during a repaired heat waive (while codes enforcement was still refusing to issue a valid certificate of rental for her unit due to a number of violations which the landlord or owner need to address)plaintiff woke up to the sound of hissing, smoke and sparks coming from an outlet which her air conditioner was plugged into.

119.    Eventually an electrician was hired to replace the outlet, and her found he issue to most likely have been cause by poor upkeep of the property, claiming that there was moisture and dust behind the wall which had caused the issue. He attributed the moister to a possible leak in the roof.

120.    **Sixteenth Cause of Action**

121.    Plaintiff was scared and outraged to find the defendant Yunis Alloush in her unit after she returned from walking her dogs. Upset and afraid, plaintive demanded to know why that defendant was inside of her unit.

122.    There was no emergency which would have permitted the Defendnat to take such action. Parties had been scheduled for an inspection from codes enforcement  when Plaintiff returned from a quick walk with her dogs a full ten or so minutes prior to the scheduled inspection only to find the Defendant inside her apartment with what appeared to be his phone out.

123.    Plaintiff demanded an explanation only for the defendant responded in part by stating that  *"i can do that ..this is my house.."*

124.    Plaintiff has since had flashbacks about this incident as well as nightmares which involve the defendant Yunis  Alloush. Plaintiff has reported these flashbacks and nightmares to her mental health provider. This provider has advised her to avoid the defendant Yunis Alloush As a part of her treatment plan for post, traumatic stress disorder.

125.    **Seventeenth Cause of Action**

126.    In July 2024 after plaintiff initiated a lawsuit against the defendants here in Schenectady a number of her neighbors who live at adjacent properties which are also owned by Ahmed Alloush and or Yunis Alloush approached her stating that they too felt mistreated and neglected by the landlord.

127.    These tenants shared their stories with the plaintiff, as well as gave her tours of their units and sent her photos of damage which she was able to see with her own eyes. One

tenant said that a part of her bathroom ceiling had collapsed on her infant son.

Thankfully the baby wasn't seriously hurt. The neighbor provided photos of the ceiling.

128.    Upon conducting due diligence, plaintiff was able to learn that none of these units or

properties had been given proper rental certificates from city of Schenectady Code

Enforcement.

129.    **Eighteenth Cause of Action**

130.    In June 2024 Zack Alloush did contact Plaintiff and stated he was tapped to help

manage the property on Belfast of his brother Yunis on behalf of their father, Ahmed.

131.    Not long after this Defendant Zack Alloush did sexually harass Plaintiff when he

contacted her via cell phone and text message at inappropriate times including early

hours of the morning and on holidays. The Defendant Zack Alloush did use a tone of

communicating which seemed unnecessarily flirtatious and that made Plaintiff

uncomfortable.

132.    **Nineteenth Cause of Action**

133.    In June or July 2024 the Defendants colluded to forge and falsify a lease agreement

relating to Plaintiff's move  to 121 Park Place, then they filed said forgery as an exhibit in

support of a motion to dismiss Plaintiff's claims pending against them.

134.    They did this after they realized that they did abide by standard agency practices

when they failed to secure Plaintiff's signature anew when her addressed changed. All

such leases contain the address of the rental unit prominently.

135.    The document produced and filed by the Defendants and their counsel in this matter

which they claim to be authentic is a Frankenstein of signature dates, years, named

parties/signatories. Put frankly the document's audacious alterations are an insult to the rule of law.

136.    **Twentieth Cause of Action**

137.    In July 2024 after plaintiff initiated a civil action against the defendants the YWCA Kim Siciliano and Tamara Rayne began to abuse the YWCA's Rule Violation 'system' to carry out a grudge against her and to constructively evict her from her housing. According to the YWCA a total of three violations can be grounds for eviction from the program.

138.    Upon receiving two baseless infractions in a row—one for alleged being rude (not threatening or name calling, just accusing her of being mean, and another alleged infraction for supposedly making statements in public — Plaintiff asked the defendants if there was a way she could challenge or appeal but was informed that no appeal or grievance process exists for clients of the YWCA to challenge an infraction or rule violation.

139.    Thank goodness Plaintivesecured a video recording from a small business which entirely exonerated her of/from any alleged infraction. In fact, the video showed that the staff member in question had lied.

140.    The defendants and their council knew or should have known that the allegations made by these staff was false or had a duty to investigate especially considering the allegations came from the the maintenance person who previously discriminated against Plaintiff amd who Plaintiff had filed a formal complaint on.

141.    Plaintiff still maintains her innocence and asserts that the infractions were retaliatory in nature.

142.    **Twenty First Cause Of Action**

143.    In the late summer early fall of 2024 a window inside of plaintiffs apartment unit cracked as the result of a windstorm which led to the window slamming shut on its own. When Plaintiff reported the damage to the Defendants the YWCA et al asked them to hire a contractor to repair the work, since she did not feel comfortable alone with Yunis Alloush, but they refused for more than two months.

144.    The defendants would eventually hire a contractor to do the work only after threatening the Defendants with further litigation and by that time plaintiff had already spent a number of nights with her apartment open to the elements. The weather outside had gone from warm and sunny to cold and snowing over the two+months it took for Defendants to finally make the needed repairs.

145.    Plaintiff asserts that the refusal of the defendants to conduct the needed repairs in a timely manner was retaliation for the myriad of good faith complaints she has made about her unit and how she is (mis)treated by the Defendants.

146.    **Twenty Second Cause of Action**

147.    In order to get the Defendants to fix her broken window Plaintiff made a formal request under the Americans with disabilities act for the YWCA to enact a policy which would help get a professional to address her window instead of Defendants Yunis and Zack Alloush. Plaintiff requested that they create a buffer between her and the defendants Yunis Alloush And his brother Zack Alloush.

148.    Plaintiff signed a release and provided the defendants access to written documentation from her mental health provider which supported the request for reasonable accommodation.

149.    The YWCA's Tamara Flanders communicated with Plaintiff's provider and shortly thereafter the YWCA's counsel in this matter Mr Joseph DiPalma Did then inform the plaintiff that the Request had been granted.

150.    Mr DiPalma informed Plaintiff in writing that the aforementioned defendants would not be contacting her or visiting her at her residence and that instead a contractor would be hired to conduct needed repairs.

151.    This was a reasonable accommodation in name only though. The YWCA took no steps to ensure the Reasonable accommodation request was carried out.

152.    Defendant Yunis Alloush ignored the RA request And plaintiff's rights as a disabled person, Showing up to her unit one morning in November 2024 and demanding she give him access to assess and repairs.

153.    When plaintiff refused to allow him access that defendant filed a false police report Against her claiming she had harassed her, even though again she was inside her own unit when he approached her unlawfully

154.    **Twenty Third Cause of Action** During the same incident when the defendant Yunis Alloush Arrived at her apartment even though there was a valid RA in place which should have prevented such contact, Defendang Alloush did cause a male companion he'd brought with him to verbally attack the plaintiff using ablest, anti-LGBT anti-transgender vulgarities, stating among other things that Plaintiff is a "man" trying to be "a woman".

155.    **Twenty Fourth Cause of Action**

156.    As of November 2024 the YWCA has turned a blind while Defendant Yunis Alloush moves to evict the Plaintiff (and the YWCA). Plaintive maintains that she has not

committed any major rule violations or infractions while residing at 121 Park Place. With

the blessing of the YWCA, Defendant Yunis Alloush claims that he his planning to

immediately evict the YWCA and its sub-tenant the Plaintiff Mariah Lopez effective

January 31st 2025.

157.    The YWCA and their counsel have refused to communicate what Plaintiff's next

placement will be based on her eligibility as well as state and federal guidelines

commonly referred to the 'continuum of care'.

158.    **Twenty Fifth Cause of Action**

159.    Based on a number of what appear to be letters sent to the Plaintiff  byYunis Alloush

she has **a**. Assaulted a municipal employee, which is objectively false and **b**. Yunis

Alloush alleges that Plaintiff's service dog injured someone. Both are patently false.

160.    Plaintiff has since reached out to animal control for the city of Schenectady, and they

have no complaint or report on file of any allegations which involve plaintiffs service dog

injuring anyone. No investigation was ever conducted because no such complaint was

ever made or received By that office.

161.    **Twenty Sixth Cause of Action**

162.    On December 28, 2024, the defendant Yunis Alloush caused an individual to stalk the

plaintiff at her home. Yunis Alloush convinced anindividuals named Andrew Wissof to

travel hundreds of miles from his home downstate near Westchester to leave a bizarre and

threatening message via letter for plaintiff at her home on a Saturday morning. The letter

was typed out there was no last name provided in this correspondence.

163.    As a direct result of this letter Plaintiff felt like Defendant Yunis Alloush was having

people watch and possibly follow her and her dogs when they left the house. This letter

caused Plaintiff to feel afraid, annoyed, disturbed and feared for her safety and the safety of her dogs as a result of this strange and creepy letter. Plaintiff has had nightmares which involve the defendant Eunice Alloush as a result of this incident and has reported to her current mental health provider.

164.    Plaintiff asserts that Yunis Alloush caused this stalker to leave this letter for her as a way to intimidate as another attempt to retaliate against to constructively evict her.

165.    **Twenty Seventh Cause of Action**

166.    On January 13, 2025 because of a plumbing issue at her unit, plaintiff made a number of good faith complaints to the Ywca. On January 14, 2025 plaintive did again make a number of good faith complaints to the defendants the Ywca and Tamara Flanders, Concerning the issue with plumbing, she was having in her unit.

167.    After being forced to send a second contractor to her apartment because the first contractor failed to adequately address the issue, the defendants did retaliate against plaintiff issuing her baseless infraction for "cussing" over the phone when trying to coordinate logistics about her toilet, which often overflowed with human waste.

# **Relief**

168.    **With regard to injunctive relief, the named plaintiff must have plausibly alleged the existence of a "real or immediate threat." City of Los Angeles v. Lyons, 46 U.S. 95, 111 (1983).**

169.    **The Fair Housing Act defines an "aggrieved person" [with standing to seek such releief] as "'any person who' either 'claim to have been injured by a discriminatory**

housing practice' or believes that such an injury 'is about to occur.'" **Bank of Am.**
**Corp. v. City of Miami, 581 U.S. 189, 197 (2017) (quoting 42 U.S.C. § 3602(i)).**

170.   **Plaintiff stands the real risk of irreparable harm in the way of homelessness and**
**the mental and emotional deterioration which accompanies it; loss of her dogs and**
**personal possessions; Plaintiff stands a high likelihood of prevailing on the merits on**
**at least one of the aforementioned claims and Defendants do not stand to be injured**
**or burdened by such releif sought within this complaint and request for TRO and or**
**other Injunctive Relief.**

171.   **<u>Injunctive Relief</u>**

172.   **WHEREFORE** Plaintiff seeks a temporary restraining order against the Defendants
preventing the Defendants from moving to initiate any eviction proceedings against the
Plaintiff until this court can review and determine these issues on the merits.

173.   Plaintiff and the circumstances of this case are similar to that of ***Lopez v NYC DHS et***
***al 17-cv-3014*** this is true in multiple respects: a)Plaintiff alleges she attempted to access
housing as a public accommodation and was denied access or treated adversely due to her
disability and b) retaliation for 'whistleblowing' and or suing the Defendantsc c)
Plaintiff's unique medical needs (which include treatment for Gender Dysphoria and
PTSD). In that's case the Court issued a TRO, the facts later revealed that there was merit
to Plaintiff's claim to ongoing abuse of power, discrimination and retaliation after a
number of other similarly situated sheletr clients came forward to corroborate Plaintiff's
claims.

https://www.nbcnews.com/nbc-out/out-news/new-york-citys-only-shelter-lgbtq-adults-nightmare
-ex-residents-say-rcna13358

**174.**    ***Doe v YMCA of NE NY* case no. 1:19-cv-456 (2020)**

In that case this circuit granted Defendant's motion to deny Plaintiff's request for injunctive relief

based on an entirely different set of facts. A state level trial court had already retained

jurisdiction of parties claims (a matter in Landlord Tenant Court) Plaintiff had already been

evicted by the time the court issued its final ruling in that matter. Here Plaintiff has not been

asked by the YWCA to move.

175.    To the contrary Tamara Flanders Rayne, in an email to Schenectady Probation Officer

Katie Soule on January 13th 2025:

*"We will be offering her space in our Rapid Rehousing program.  This is a*

*program that offers 9-12 months of financial assistance paying for rent.*

*She can choose her own apartment within a budget, and it can be in*

*Schenectady, Albany, Troy, Saratoga and surrounding areas.*

*Consideration can be given for apartments at more of a distance.  "*

176.    **Yet as of the time of this filing the Defendants the YWCA and their counsel have**

**yet to contact Plaintiff about moving. Plaintiff argues that this is because like in Doe**

**v YMCA the agency the YWCA prefers to attempt to insulate itself from legal**

**liability by encouraging the Landlord, here the Defendants Yunis and Ahmed**

**Alloush to engage in bad acts on their behalf.**

177.    **Given the above statement issued by the YWCA to P/O Soule on January 13th,**

**as well as the YWCA-Defendants meager opposition to Plaintiff's request for a**

**TRO, it is clear that they will not be burdened by the issuance of a restraining order**

**preventing them (the YWCA Defendants) from putting Plaintiff and her dogs out onto the street.**

178.    The 'Alloush Defendants' would not be harmed or burdened by such an order either as they currently own close to two dozen properties which they rent commercially to social services providers at fair market value. Put simply the 'Alloush Defendants' have made a small fortune off their residential properties and will not be impacted in the immediate future if this court issues a Temporary Restraining Order against evicting Plaintiff.

179.    **WHEREFORE** Plaintiff asks this court to block the Defendants from initiating any new eviction proceedings against the Plaintiff and

180.    **WHEREFORE** Plaintiff asks this court to Order the YWCA to forthwith explore all options for Plaintiff it outlined in its correspondence to Schenectady County P/O Soule on January 13th (above) and;

181.    **WHEREFORE** Plaintiff asks this court declare that the Defendants have retaliated against the plaintiff based on the constitution and the laws of the state of New York including but not limited to unlawful discrimination based on race, disability, sexual orientation, gender identity ("*SONDA*" and "*GENDA*" respectively) and;

182.    Defendants have engaged in coordinated, pervasive and ongoing pattern of deprivation of Plaintiff's civil rights including race and gender based discrimination, constructive eviction of a tenant in the state of New York, and a notable escalation in hostility directed against her Plaintiff.

183.    **WHEREFORE** Plaintiff is seeking Declaratory relief in the form of: an Order declaring that Defendants deprived plaintiff her civil rights by: housing her at units with a

number of serious health or safety violations, then relating against her when she made good-complaints about these conditions; The Defendants collective and individual refusal to provide Plaintiff a number of reasonable accommodation she is entitled to based on Plaintiff's documented medical needs, and, and order declaring that any and all infractions levied at Plaintiff known as "Rule Violations" by the YWCA a federal funded non profit, which have no appeal or grievance process which clients of Rosie's House (including the Plaintiff) may avail themselves of prior to being denied services or housing unconstitutional, and all such infractions null, void and unenforceable.

184.    **WHEREFORE** based on the Defendants coordinated, pervasive and ongoing pattern of deprivation of Plaintiff's civil rights including race and gender based discrimination, constructive eviction of a tenant in the state of New York, and a notable escalation in hostility directed against her Plaintiff seeks $500,000 and asks that thus court award treble damages and;

185.    **WHEREFORE** Plaintiff seeks  $500,000 in compensatory damages and  $500,000 in punitive damages from the YWCA for loss and or destruction of her regions item know as an "eleggua"when the agency moved Plaintiff from 3 Madison Street to 121 Park Place, and refused to replace it;

186.    **WHEREFORE** Plaintiff is also seeking $ 1,000,000 in punitive damages against the each and every one of the Defendants for intentionally depriving her of her civil right and trying to make her and her dogs homeless in the middle of winter

**Finally, the plaintiff asks this court to issue any and all relief. It seems just and proper.**

**Thank you**

**Respectfully submitted**

**_____/s/_____**

**Mariah Lopez**

**Plaintiff, pro se**

**January 27th, 2025**